(Hamilton County Common Pleas, 1901.)
STEPHEN R. BURTON et al. v. SANSOM N. COOPER, et al.

In the construction of an ambiguous covenant appearing in a deed the words must be taken in their ordinary sense; the intention expressed by the words used may be gathered from the surrounding circumstances, and if the parties themselves have put a construction upon the instrument that construction will be followed by the court.

If land is laid out for sale as building lots and put upon the market as subject to conditions or restrictions that are held out to purchasers as applying to the whole tract so as to create a general plan of subdivision, any person taking the lots with either actual notice as by covenants embodying the conditions or restrictions appearing in the chain of title of the lots or constructive notice as by the plan itself, will be bound by the conditions, and a court of equity will aid any purchaser in preventing any of the other purchasers or owners from defeating the plan.

Such a plan is not abandoned until the parties have waived the rights accruing to them from the covenants or general plan, or until the plan is so far abandoned that the original purpose is defeated thereby.

SPIEGEL, J.

In the month of May, 1893, Robert Mitchell, owner in fee of a tract of land to the north of Avondale, had the same laid out in lots and platted as the Rose Hill subdivision, and numbered said lots from 1 to 122. Said platting was done by Messrs. Earnshaw and Punshon, surveyors, and upon putting said lots in the market, this plat was printed as an advertisement, with the following announcement prominently placed upon it:

"Rosé Hill Park" is the choicest property now offered about Cincinnati.

The natural advantages of the tract as to elevation, drainage and magnificent views are the best in Hamilton county.

More than $100,000 have been expended in permanent improvements, so that absolutely nothing remains for the purchaser of a lot to do but build his house.

All the avenues have easy grades, and are improved with asphalt for the roadways and granitoid for the curb, gutter and sidewalks.

The sewer, gas and water pipes extend to the front line of every lot, saving a great expense and trouble to purchasers.

The Reading road, handsomely improved, direct to this subdivision, has on either side an almost continuous succession of fine residences and lawns, and has also the greatest width and easiest grades of any thoroughfare from the heart of the city, the time being only 20 to 25 minutes from "Fountain Square" by the finest electric car service in this city, and no incline planes nor steam railroad crossings.

The lots are much deeper than the average, and the subdivision is laid out on the park lawn plan.

The elegant residences in the vicinity of this tract, and the conditions under which houses are built thereon, gives assurance that this charming spot, with its many advantages, will become the most popular and desirable for the erection of beautiful suburban homes.

The means of access are unsurpassed, the scenery magnificent in every direction, and considering the important facts that there will be no assessments for streets and other purposes and no expense for grading or draining the lots, this subdivision has no equal in point of completeness in the state of Ohio. To those intending to build the lots at present prices are much cheaper than any others in the market.

| Good Lots, | Choice Lots. |
|---|---|
| 150 to 200 ft. deep, at $35 to $50 per ft. | 150 to 220 ft. deep at $50 to $65 per ft. |

BEAUTIFUL LOTS,

174 to 250 ft. deep, at $65 and $90 per ft.

Contracts were printed and entered into by the purchasers of the lots containing the following covenants:

"That the said ———, heirs, representatives or assigns shall use said premises hereby conveyed for residence purposes only, including necessary out-buildings thereon and a stable; that no dwelling house shall be erected or re-erected or maintained on said premises to cost less than $—, and that the front of said dwelling house, or any part thereof, or any structure thereon, shall not be nearer than — feet from the front line of said premises, and said premises, or any dwelling house which may be erected thereon, shall not be used for any mercantile, manufacturing or business purposes, or for a public or private hospital, or for infirmary purposes; and no fermented, distilled or other liquors shall be sold on said premises hereby conveyed. In the street, at front or side of the lot herein conveyed, shall be planted neither trees, nor shrubs, nor plants of any kind, which, at time of planting are, or may grow, higher than four (4) feet.

These covenants were placed in every deed, and the different purchasers bought pursuant to them.

On the 9th day of August, 1899, Robert Mitchell conveyed all of the remaining lots, a few having been sold, reserving thirteen lots to himself, to Richard H. Mitchell, Albert H. Mitchell and David T. Robb, trustees, who thereupon adopted the printed plat, agreement and deed, and continued to sell lots in pursuance to the terms and conditions contained therein.

Upon this undisputed state of facts plaintiffs pray for a permanent restraining order against the defendants, S. M. Cooper and M. Y. Cooper, purchasers of lot 27 of said subdivision, prohibiting them from erecting two dwelling houses on said lot.

Defendants derive title from Albert H. Mitchell, one of the heirs of Robert Mitchell, deceased, the remaining lots of Rose Hill subdivision having been divided by the trustees among the heirs, in accordance with the terms of the deed of trust from Robert Mitchell.

The deed to these defendants is different from other deeds in this, that their grantor has changed the wording of the covenant "that the front of said dwelling house or any part thereof, or any structure thereon" to read "that the front of said dwelling house or any separate structure on said lot."

The question presented to the court is, therefore, whether the covenants contained in the defendant's chain of title must be interpreted to mean the building of only one house, with necessary outbuildings and a stable, on each lot; and, secondly, if this question should be answered in the affirmative, whether there was such a general building scheme or plan of subdivision instituted by Robert Mitchell and his successors for the common benefit of all, and known to all the purchasers, who relying upon it built in accordance therewith, as to bind the heirs of Mr. Robert Mitchell, as well as all the property holders in the subdivision, including the defendants.

In determining, first, whether the covenants contained in the contracts and deeds mean the building of one house or more upon one lot, I shall interpret the terms of the covenant in their ordinary word meaning, and in order to arrive at the correct interpretation, construe it together with the terms of all covenants contained in each contract and deed, the terms of the advertisement upon the printed plat used by both Robert Mitchell and the trustees, as well as with the interpretation put upon these covenants by the purchasers of lots, inclusive of the defendants.

The advertisement contained upon the printed plat announces Rose Hill Park to be the choicest property now offered about Cincinnati. It further states that more than $100,000 have been expended in permanent improvements, so that absolutely nothing remains for the purchaser of a lot to do but build his house. Further: "The lots are much deeper than the average, and the subdivision is laid out on the park lawn plan." Further: "the elegant residences in the vicinity of this tract, and the conditions under which houses are built thereon, gives assurance that this charming spot, with its many advantages, will become the most popular and desirable for the erection of beautiful suburban homes."

In accordance therewith, the following covenants were placed both in the contract of sale and in the deeds:

That the said grantee, ——, heirs, representatives or assigns, shall use said premises hereby conveyed for residence purposes only, including necessary outbuildings thereon and a stable; that no dwelling house shall be erceted or re-erected or maintained on said premises to cost less than $—, and that the front of said dwelling house or any part thereof, or any structure thereon, shall not be nearer than —— feet from the front line of said premises, and said premises or any dwelling house which may be erected thereon, shall not be used for any mercantile, manufacturing or business purpose, or for a public or private hospital, or for infirmary purposes.

In interpreting the writing in all these instruments, beginning with the printed plat, I find that one dwelling house, one stable, is mentioned throughout. The lots have been conveyed by plat number, not by metes and bounds, and the purchaser, in order to determine the dimensions of his lot, had to have recourse to the printed plat. Construing the language used in all these instruments, the conclusion seems to be irresistible, that the plan adopted by Mr. Robert Mitchell, expressed by the covenants where the expression "house," "outhouse," "stable," "dwelling house," is used, is to restrict the use of each lot to a single dwelling, unless permission is granted by the other lot owners to the grantees to build more than one house.

This interpretation of these words is borne out by the construction which the parties themselves have put upon them, by building in nearly in all cases but one dwelling house upon each lot. In many of the deeds, in addition to the aforesaid covenants, all ambiguity is avoided by having therein the words

"only one dwelling house shall be built on each lot". This is especially the case in the earlier deeds wherein must be sought the interpretation of the purpose of the founder of the subdivision, Mr. Robert Mitchell.

Mr. Earnshaw, who platted the subdivision for the founder, received two lots in payment, and his deed contains this restriction. And although his lots have a frontage of 280 feet on Rose Hill avenue, in order that his grantee might exercise the privilege of building three houses upon this frontage, he had to obtain a release and waiver from the trustess, Albert H. Mitchell, Richard H. Mitchell and David T. Robb, as well as from all the other owners of lots in said subdivision.

I have already said that nearly every other lot owner, who did not have these extra restrictive words, construed the covenant to mean the building of but one house upon each lot, and acted in accordance with such interpretation.

[And finally, the defendants themselves have placed this interpretation upon these covenants by having the words "and that the front of said building house, or any part thereof, or any structure thereon," changed in their deed to read, "and that the front of said dwelling house or any separate structure on said lot."

I, therefore interpret said covenant to prohibit the erection of more than one dwelling house, with necessary outbuildings and a stable, on one lot.

The next question to be determined is: Are the defendants bound by this interpretation? It will be seen that the deed received by them from their grantor, Albert H. Mitchell, removes the prohibition to build more than one house on each lot, by changing the language of the covenant of the deed.

In order to solve this question, I shall apply to the testimony introduced in this case the law laid down by Vice-Chancellor Greene, in the case of DeGray v. Monmouth Beach Club House Company, 50 N. J. Eq., 329, the leading American authority upon the issues involved in this suit, and cited by counsel for defendants as an authority in their favor:

The law deducible from these principles and the authorities applicable in this case is, that where there is a general scheme or plan, adopted and made public by the owner of a tract, for the developement and improvement of the property, by which it is divided into streets, avenues and lots, and contemplating a restriction as to the uses to which buildings or lots may be put, to be secured by a covenant embodying the restriction, to be inserted in each deed to a purchaser; and it appears, by writings or by

the circumstances, that such covenants are intended for the benefit of all the lands, and that each purchaser is to be subject to and to have the benefit thereof, and the covenants are actually inserted in all deeds for lots sold in pursuance of the plan, one purchaser and his assigns may enforce the covenant against any other purchaser and his assigns, if he has bought with knowledge of the scheme, and the covenant has been part of the subject matter of his purchase.

The right of action from this would seem to be dependent as much upon the fact of the general scheme as on the covenant—a very important consideration in a case in which the question arises whether certain threatened acts are in violation of the covenant, if any ambiguity exists as to its scope and meaning.

Thus the law. What are the facts in the case at bar? There is no dispute in the testimony that land known as Taylor's Avondale Park and the Blakely farm were laid out and platted by Mr. Robert Mitchell as the Rose Hill Park subdivision; that streets were dedicated to the public, the plat recorded in the Hamilton county records, and copies of the plat with all its announcements distributed to intending purchasers, referring them to the system of subdivision designated as the park lawn plan, the natural advantages, the asphalt paved avenues, the depth of the lots, the elegant residences, the fact that no assessments for streets or other purposes and no expense for grading and draining lots would be incurred by purchasers, and finally that absolutely nothing remained for the purchaser of a lot to do, but build his house.

The testimony further shows that it was the general understanding from the time of Mr. Robert Mitchell to the time of the purchase by the defendants of lot 27, that but one dwelling house should be erected on each lot; an understanding in accordance with the covenants contained in each deed, and understood by every purchaser to mean this, although by some believed not to be binding upon them.

The testimony of Mr. Cleneay, the first agent chosen by Mr. Robert Mitchell to sell the lots, and of Messrs. Hill, Bahlman, Kroger, Ellis, Earnshaw, Neare and Durrell, and of Mrs. Ellis and of Mrs. Redway, tend almost irresistibly to this conclusion.

The evidence is clear that there was a general scheme or plan adopted and made public by Robert Mitchell and continued by the trustees in the development of Rose Hill Park, by which the park was divided into avenues and lots, contemplating a restriction as to the uses to which the lots and buildings should be put, secured by covenants embodying these restrictions contained in each deed to a purchaser.

It further, clearly appears from the writings, oral testimony and surrounding cir-

cumstances that such covenants were intended for the benefit of all the lots, and that the original owners, as well as each purchaser, were to be subject to and to have the benefit thereof.

It is clear, therefore, that the rule that where lots are sold pursuant to a plan established by the vendor, and made known to the purchasers, by which the whole tract was to be subject to the same restrictions, the vendor will not be at liberty to sell any part of it free from the restrictions, applies to the heirs of Robert Mitchell. (See Talmadge v. The East River Bank, 26 N. Y., 105; Lenning v. Ocean City Association, 41 N. J. Eq., 606; Parker v. Nightingale, 6 Allen, 341; Newman v. Ellis, 97 N. Y., 285; Duke of Bedford v. British Museum, 2 M. & K., 552; In Re Birmingham & Dist. Land Co., and Allday, 27 Notes of Cases, 147).

Possibly one of the clearest expositions of the law upon this brand of real property was made by Lord Macnaghten in Spicer v. Martin, 14 App. Cases, 23 (1889):

"The law on the subject has never been stated more clearly than it was by Vice-Chancellor Hall in Renals v. Cowlishaw. The opinion of that learned judge on any question relating to conveyances and real property law, owing to his great experience as a conveyancer, would of itself carry the utmost weight. In this instance his opinion was emphatically confirmed in the Court of Appeals, where Lord Justice James expressly concurred in every word of the Vice-Chancellor's judgment. It has also, I may observe, been approved and followed ir the Queen's Bench Division (Nottingham Patent Brick & Tile Co. v. Butler).

"'It may, I think,' observes the Vice-Chancellor, 'be considered as determined that any one who has acquired land, being one of several lots laid out for sale as building plots, where the court is satisfied that it was the intention that each one of the several purchasers should be bound by and should as against the other have the benefit of the covenants entered into by each of the purchasers, is entitled to the benefit of the covenant; and that this right, that is, the benefit of the covenant, inures to the assign of the first purchaser; in other words, runs with the land of such purchaser. This right exists not only where the several parties execute a mutual deed of covenant, but wherever a mutual contract can be sufficiently established. A purchaser may also be entitled to the benefit of a restrictive covenant entered into with his vendor by another or others where his vendor has contracted with him that he shall be the assign of it, that is, have the benefit of the covenant. And such covenant need not be expressed, out may be collected from the transaction of sale and purchase.'

"I should be disposed to hesitate if I were invited to extend the principles recognized in Renalds v. Cowlishaw. But those principles, as defined by the Vice-Chancellor, are, I think, perfectly sound, consistent with the authorities, and consistent with good sense. I think they apply to the present case, and I think they must govern it.

"If the site of the houses now known as Cromwell Gardens had been put up for sale by auction in building lots, according to a plan corresponding with that on Mr. Martin's lease, and if the conditions of sale had prescribed that houses should be built such as those which have actually been erected, and that every purchaser should bind himself by a covenant, in the terms of the restrictive covenant now in question, no one, I think, could have doubted that each purchaser would, as against the vendor, and as against every co-purchaser, have had a right to the benefit of the covenant, although there might have been no direct stipulation to that effect, and no express provision for mutual covenants by the purchasers inter se. What difference is there between the case I have supposed and the case which has occurred? The site was laid out in accordance with a building scheme. The houses were to be built as private houses, and to be used for no other purpose; a covenant to that effect was imposed on the builder who bought the ground, and intended to parcel it out and sell it or let it again. The houses were actually built as private houses, and offered to the public as such. Their character was unmistakable; and every person who took one of the houses was required to enter into the same restrictive covenant. All this in one way or another was brought to Mr. Martin's knowledge. Every lessee in ordinary course must have had the same information as Mr. Martin had. Every lessee must have known that every other lessee was bound to use his house as a private residence only. This restriction was obviously for the benefit of all the lessees on the estate; they all had a common interest in maintaining the restriction. This community of interest necessarily, I think, requires and imports reciprocity of obligation.

"As regards the appellant, the case, I think, is doubly clear. It seems to me that when Mr. Spicer put his houses in Cromwell Gardens on the market, he invited the public to come in and take a portion of an estate which was bound by one general law—a law perfectly well understood, and one calculated and intended to add to the security of the lessees, and consequently to increase the price of the houses. The benefit of that increase, whatever it was, Mr Spicer got. Can he or his representatives be permitted to destroy the value of the thing he sold by authorizing the use of part of the estate for a purpose inconsistent with the law by which he professed to bind the whole?"

Did the defendants have notice of the covenant to erect but one dwelling house upon each lot? Mr. S. M. Cooper, who purchased the lot in his own and brother's names and acted on the latter's behalf, was for some time an agent to sell the lots. He testifies to his thorough familiarity with the property, he talked with a great many purchasers, took part in the sale of various lots, upon each of which but one dwelling house was erected, especially in the sale of lot number 31, part of which was sold to Mr. Harrison and a part to another purchaser, in which transaction the covenant to erect but one dwelling house was clearly expressed. I gather from his testimony that he, like several other purchasers, while aware of the fact, as he believed, that it was desired that but one house should be built on each lot, did not believe the covenant contained in the deed sufficient to compel such restriction, and, therefore, thought himself at liberty to built more than one house.

But, as I have already said, independent of a covenant, when there is a general plan for the improvement of a whole subdivision, it is the plan itself which the subject of the notice, and every one who, with notice of the plan, takes any part of the land to which the notice applies, takes subject to an obligation in equity to observe the restrictions imposed for the puropse of carrying the plan effect for the common benefit; and since all the purchasers are interested in maintaining the scheme, a court of equity will aid any one of them in preventing any of the others from defeating it.

In the case at bar, however, I have already interpreted the language of the covenants to mean the building of but one house upon each lot, this being in accordance with the general plan established by the vendors and acted upon by the purchaser, and both the grantor of the defendants, as well as the latter, are bound by it.

One more question needs to be considered here. Defendants claim that the general plan has been abondoned, because upon one or two lots there have been elected more than one dwelling house; but in order to have this effect, there must be evidence that plaintiffs have waived the right accruing to them from the covenants and general plan.

In Clark v. Martin, 49 Pa., 298, a leading case upon this branch of the law, it was held that the restriction relied on there was not waived, although in the form of a condition and although part of this condition had been released.

In Landell v. Hamilton, 175 Pa., 327, the the court held that where a building restriction is still of substantial value to a dominant lot, notwithstanding the changed use of the lands and buildings, equity will restrain its violation if relief is promptly sought.

In Payson v. Burnham, 141 Mass., 556, the court says:

"The fact that other bay windows have been erected without express objection does not cut off the plaintiff's right to object to one which injuriously affects them. According to the plan used at the hearing there was no building so near to the plaintiff's house as to interfere with their prospect or to afford the least presumption or a waived by them."

An instructive case in Rowland v. Miller, 139 N. Y., 103, where the court says:

But it is contended that the restrictive agreement ought not in this case to be enforced, because most of the lots in the block between Forty-second and Forty-third streets and Madison avenue and Vanderbilt avenue are no longer occupied for residences, and are devoted to business purposes, and the counsel for the appellant cites as an authority on this point our decision in the case of the Trustees of Columbia College v. Thacher. The principles of that case are not applicable to the facts of this. There it appeared that the contract with the plaintiff sought to enforce was no longer of any value to it, and that its enforcement would result in great damage to the defendant without any benefit to any one. Here the plaintiff has the right to occupy her house as a residence, and in such occupation to have the protection of the restriction agreement. She has never violated agreement herself, or consented to or authorized or enforced its violation by others. In order to have the benefit of the agreement, she in not obliged to sue all its violators at once. She may proceed against them seriatim, or she may take no notice of the violations of the agreement by business carried on remotely from her residence, and enforce it against a business specially offensive to her by its proximity. This is not a case where the defendants can ask for immunity in an equitable forum, because others are in a greater or less degree also violators of the agreement. The plaintiff has done nothing and omitted nothing which should authorize the occupant of an adjoining lot, in violation of the agreement, to make her residence uncomfortable and undesirable. Generally, whether an equity court wil refuse to restrain the violation of such an agreement, and leave the parties to their legal remedies on account of the changed conditions affecting the premises to which the agreement relates, rests in the discretion of that court, and such discretion will not be reviewed upon appeal here. The question to be determined in the exercise of such discretion depends largely upon the facts, and

mainly whether the enforcement of the agreement would greatly harm the defendant without any substantial benefit to the plaintiff as to make the enforcement inequitable. We can not say, reviewing all the evidence in this case, that it would be inequitable for the plaintiff to enforce the agreement".

I might cite other cases, notably McGuire v. Caskey, 62 O. St., 426, 43 B., 369, and Linwood Park Co. v. Van Duzen, decided by our Supreme Court October 16, 1900, and found in 44 W. L. B., 295, upholding the same doctrine; but it is not necessary to go any further. No testimony has been introduced that the plaintiffs acquiesced in the two variations from the original plan, and no testimony that there has been any change in the character of the improvements in Rose Hill Park to any perceptible degree, much less to such an extent as to change the original purpose of the plan established by Mr. Robert Mitchell.

My conclusion from the testimony is that the heirs of Mr. Robert Mitchell can no at this late day change the nature of the plan adopted for the common benefit of all the lot owners by their ancestor by giving deeds changing the original covenant prohibiting the building of more than one dwelling house upon each lot; and that the defendants having had full knowledge of the plan and of the covenants in the claim of their title are bound thereby.

A permanent restraining order, therefore is granted against the defendants prohibiting them from building more than one dwelling house with necessary outbuildings and a stable upon lot 27 of Rose Hill Park subdivision.

Charles A. Groom, Peck, Shaffer & Peck for plaintiffs.

C. J. McDiarmid and Ernest Rehm contra.